UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA



PLAINTIFF'S EXHIBIT 2

EDWENA R. HEGNA, et al.,

    Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN
and
THE IRANIAN MINISTRY OF
INFORMATION AND SECURITY,

    Defendants.

Civil Action 00-00716 (HHK)

FILED

JAN 2 2 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM

Edwena R. Hegna, the widow of Charles Hegna, brings this action individually and as Executor of her husband's estate on behalf of herself and their four children, Steven A. Hegna, Craig M. Hegna, Lynn Marie Hegna Moore, and Paul B. Hegna. Each of the children also sues in his or her own right. The action is brought against the Islamic Republic of Iran and the Iranian Ministry of Information and Security pursuant to a 1996 amendment to the Foreign Sovereign Immunities Act, 28 U.S.C. §1605 (a)(7).

The default of defendants was entered properly on February 21, 2001. Commencing October 15, 2001, this court held a bench trial to receive evidence regarding plaintiffs' claims. Based on the evidence presented at the bench trial, including the findings of other courts in cases successfully prosecuted against the

United States District Court
For the District of Columbia
A TRUE COPY
NANCY MAYER WHITTINGTON, Clerk
By _____
3/4/02  Deputy Clerk

Islamic Republic of Iran and the Iranian Ministry of Information and Security based on these entities' sponsorship of terrorist activities, the court makes the following:

## FINDINGS OF FACT

### I. Events Surrounding the Murder of Charles Hegna by Hezbollah Terrorists

1. At the time of his death Charles Hegna was 50 years old and was a citizen of the United States of America domiciled in the Commonwealth of Virginia. He was temporarily stationed in Karachi, Pakistan, where he was employed as a deputy inspector general with the Agency for International Development, United States Department of State ("AID").

2. On December 3, 1984, Hegna was traveling as a passenger for hire on Kuwait Airways Corporation flight #221 ("KAC #221") from Kuwait City to Karachi, Pakistan, with an intermediate stop at Dubai, United Arab Emirates, where additional passengers boarded. Hegna was returning to the AID mission in Karachi, with his fellow auditors, William Stanford and Charles Kapar, after completing an audit in Sanaa, Yemen.

3. On December 4, 1984, KAC #221 was hijacked by heavily armed Hezbollah (variously spelled Hizbollah and Hizballah) terrorists. During the course of the hijacking, Hegna was held hostage, assaulted, beaten, tortured, and finally brutally murdered.

4. The aircraft was hijacked as it began to turn toward Karachi over international waters in the Gulf of Oman. The attack was carried out as the plane came within range of a radar checkpoint, Chah Bahar, on the Iranian coast.

5. The hijacking was carried out with the military precision and "professionalism" that accompanied similar Hezbollah operations. The hijackers' method of operation evinced their special training in airline hijackings, which included the use of techniques to conceal their identities and avoid detection. For example, they clearly had received extensive intelligence briefings on airport security at Dubai, as well as assistance with complex interline routing. The hijackers' "sophisticated" methods were replicated in Hezbollah's hijacking of TWA flight #847 in June, 1985.

6. The hijackers stormed through the aircraft's unlocked cockpit door. As one of them brandished a small caliber automatic pistol and another pressed a hand grenade to the neck of the pilot, "Harry" K. Clark ("Capt. Clark"), the hijackers demanded to be flown to Tehran, Iran.

7. Once they secured control of the aircraft, the hijackers commenced a systematic review of passengers' travel documents and passports in order to identify citizens of the United States and Kuwait. When the hijackers demanded that Americans identify themselves, the first person to do so was Hegna.

8. KAC #221 flew to Tehran with an Iranian fighter escort over the first leg of the flight as it crossed into Iranian territory from the Gulf of Oman a few minutes after the hijacking.

9. As the plane flew toward Tehran, the hijackers hit Hegna on the head and generally roughed up the mild-mannered auditor as they shoved him into the first class cabin of the aircraft, where he was temporarily confined.

10. Hegna also was threatened with death by the hijackers. He could not have failed to see that the hijackers had already shot a Kuwaiti security guard, whom they dragged from the first class cabin, through the length of the economy cabin, to the rear galley.

11. Hegna had been removed from the first class cabin to the economy section of the aircraft when Charles Kapar next saw Hegna. Hegna appeared to be very upset.

12. The Hezbollah hijackers' behavior and appearance, particularly their violent frenzy, terrorized all of the passengers and airline employees on the plane. The passengers and airline employees feared that gunfire or a hand grenade explosion might cause major damage to the KAC aircraft's fuselage and cause the plane to crash.

13. Mohammed Al-Jassar, the co-pilot, became so afraid for his own life that he begged the aircraft commander to allow him to fly the aircraft to Tehran so that the hijackers would assume that Al-Jassar was needed to fly the aircraft. Capt. Clark acceded to this request.

14. The plane landed in Tehran at about 5:20 a.m. local time on December 4, 1984. Upon landing at Tehran, the aircraft was met by an array of Iranian vehicles,

4

including one assigned to a person who referred to himself as "Mike Oscar Mike" with whom Capt. Clark and Al-Jassar were in radio contact.

15. The hijackers immediately demanded the release of their fellow Hezbollah terrorists, the so-called Da'wa Prisoners in Kuwait, whom they described as their brethren. Hezbollah is known as Da'wa in Lebanon.

16. The Da' wa Prisoners had earlier attacked the American and French embassies in Kuwait, killing American and French citizens. On December 4, 1984, they were serving life sentences in Kuwait for these crimes.

17. Shortly after the plane landed in Tehran, the hijackers pulled Hegna out of his seat in the economy class section of the plane. One of them grabbed him by the hair and another twisted his arm behind his back, as they shoved him forward into the cockpit area of the plane.

18. Hegna was next forced to kneel between the pilot and co-pilot while one of the hijackers pointed a pistol at his head and threatened him with death. As he knelt, the hijackers' broadcast their intention to kill him over the plane's radio.

19. Capt. Clark, seated next to Hegna, observed Hegna praying and in great fear.

20. The hijackers then jerked Hegna to his feet and, after more punching and shoving, dragged him out of the cockpit into the area of the forward galley in the first class cabin, approximately opposite the left front door of the plane. There the hijackers' apparent leader, whom the hijackers called Abu Hassan, but whose real

5

name is Hassin Iz Al Din, grabbed Hegna, pulled him closer to himself, shoved his gun into Hegna's body, and shot him.

21. The hijackers then opened the aircraft's forward door and threw Hegna to the ground, where he was observed to be sitting upright with his legs folded under him yogi-style and still alive. The hijackers then shot at Hegna from the aircraft's forward door as he sat wounded on the tarmac.

22. Initially, the hijackers refused a request to allow an ambulance to transport Hegna to a hospital in order for him to receive medical treatment. After 20 minutes, however, the hijackers finally agreed to allow an ambulance to take Hegna to a medical facility at the airport. When the ambulance picked Hegna up, Capt. Clark was told by Iranian personnel at the airport that Hegna was still alive.

23. Hegna's body was examined by Major Larry Barnes, M.D., at the 97th General Hospital, Frankfurt, Germany, on December 11, 1984. The date of death is reported as December 6, 1984. A prior examination was performed on Hegna's body by personnel at the Legal Medical Center in Tehran on December 10, 1984. According to the Director General of the Legal Medical Center, Hegna died from bullet wounds to the abdomen and hemorrhage of internal organs on December 6, 1984. Therefore, death resulted sometime between 42 and 66 hours after Hegna was shot.

24. Death from a gunshot wound or wounds to the stomach is extremely slow and painful. Wounds of the type sustained by Hegna, left untreated, result in

hemorrhaging, infection of the wound, and finally shock and death. The victim suffers throughout from vomiting, agonizing thirst, and intense abdominal pain.

25. It is apparent that the hijackers were trained in the use of small arms and shot Hegna in the stomach, rather than in the head or other vital area, in order to inflict the maximum amount of pain and suffering possible.

26. To a reasonable degree of medical certainty, Hegna suffered extreme pain and mental anguish from his gunshot wounds from approximately 6:00 a.m. on Tuesday, December 4, 1984, until his death, sometime before midnight on Thursday, December 6, 1984.

27. On December 7, 1984, Al-Jassar fled the aircraft. The Iranian authorities did not allow him to go with the Kuwaiti officials at the airport. Al-Jassar received an injection that knocked him out for 24 hours. He was not allowed to meet or talk with his KAC superiors at Tehran until the hijacking concluded. The Kuwaiti authorities similarly had no contact with the wounded security guard, Nabil Amin, during the hijacking. These actions prevented information from reaching Kuwait and assisted the hijackers.

28. Following Hegna's murder, Secretary of State George Shultz requested that Iran provide the United States Department of State with assistance in completing its statutory duty to investigate Hegna's death. Iran failed to provide information requested by the Secretary of State, including Hegna's estimated time of death and the type of wounds he sustained (i.e., whether the wounds were contact, powder,

7

tattooing, tangential or long-range; and whether they were sustained ante-mortem or post-mortem).

29. Iran failed to comply with its treaty obligations to provide information concerning Hegna's death and the details of the hijacking, as requested by the Secretary of State.

30. When the hijacking finally ended on December 10, 1984, the four Hezbollah terrorist hijackers were last seen in the company of the Iranian authorities who first announced that the hijackers would be tried. However, the Iranian authorities never released the names of the hijackers, nor produced their photographs or fingerprints, nor interviewed the victims, nor conducted any investigation whatsoever into the hijacking. They failed to supply the results of the Hegna autopsy and to produce the bullets which wounded and killed Hegna and his fellow auditor, William Stanford. They refused to return Charles Kapar's luggage, which likely bore the hijackers' fingerprints. In short, the hijackers of KAC #221 were free to go on their way without prosecution and without any means to identify them easily.

## *II. Hezbollah, Agent of the Islamic Republic of Iran*

31. At the time of the KAC #221 hijacking, Hezbollah had been in existence for approximately one and one-half years. It was also known at Islamic Jihad and Party of God. It came about through a merger of Lebanese Shiites of the Da'wa Party and Hussin Musawi's Islamic Amal. It was headquartered in West Beirut and the Bekaa Valley, Lebanon. Hezbollah's leaders reported to Iran, its state sponsor.

The Iranian Ministry of Information and Security ("MOIS") provided Hezbollah with guidance and financial support.

32. The Iranian government, acting through MOIS, desired to establish a militant organization that would use armed force to oppose the Israeli presence in Lebanon and counter Western influence in that country, as well as carry out highjackings of international air carriers and engage in terrorist acts directed against American citizens and their property throughout the Middle East. The Iranian government, acting through MOIS, saw the Shiite population of Lebanon, historically the lowest rung of Lebanese society, as a vehicle for Iran to gain influence in the area and thereby further its goals.

33. Iran provided support to Hezbollah in a variety of ways. For example, 2,000 soldiers from the Revolutionary Guard of the Iranian military set up headquarters in the Bekaa Valley and assisted Hezbollah terrorists by providing them with mockups of aircraft where hijackers could be trained. The Iranian government supplied funds, military arms, training, and other supplies to Hezbollah. The Iranian government also issued propaganda to encourage Lebanese Shiites, who greatly admire Iran, to join Hezbollah, thereby providing more terrorists.

34. Imad Mughniyah, an important Hezbollah leader, is the brother-in-law of Mustafa Badreddin, one of the Da'wa prisoners. In 1982, Mughniyah joined Hezbollah. By 1989, he had become chief of Hezbollah security and one of its most powerful leaders. Mughniyah launched a hijacking campaign in 1984 to free the Da'wa prisoners. Mughniyah's work in Hezbollah is funded by Iran. He is under

indictment in the TWA #847 hijacking together with Iz al Din. Mughniyah and Iz al Din were the masterminds of both hijackings.

35. Iran's and MOIS' hijacking activities utilizing Hezbollah commenced on July 31, 1984, approximately four months before the hijacking of KAC #221. At least three Hezbollah terrorists hijacked an Air France airliner to Tehran and then blew up the aircraft on the runway at Tehran before turning themselves in to Iranian authorities. The Iranian authorities released these hijackers and failed to comply with requests for information about them, such as requests for their true identities, fingerprints, and photographs. These requests were based upon on Iran's treaty obligations and were made by the International Air Transport Association ("IATA") (an association of all of the world's principal airlines), which sought Iran's compliance with International Civil Aeronautics Organization standards.

36. IATA also repeatedly requested that Iran make available all information on the hijacking and the hijackers of the KAC #221 aircraft, as Iran is required to do pursuant to its treaty obligations. This would have required disclosure of the hijackers' names, methods of operations, photographs, fingerprints, and disclosure of all facts surrounding the hijacking, including where and how pistols, hand grenades, and explosives were loaded aboard KAC #221. Iran did not supply the requested details and thereby assisted Hezbollah.

37. Iran released Iz al Din, the Hezbollah gunman who murderd Hegna and William Stanford aboard KAC #221. Iz al Din thereafter participated in the hijacking of TWA #847 in June 1985, where he murdered Robert Stetham, an

10

American citizen. Iz al Din and Mughniyah have been indicted by a United States grand jury for the murder of Stetham.

### III. Plaintiffs' Injuries and Damages

38. The Hegna children and their mother continue to suffer as a result of the brutal murder of Charles Hegna, whose sudden violent death has left them with still unresolved mental anguish, grief and pain.

39. From the first announcement to the world that a Karachi-bound, Kuwait aircraft had been hijacked, the Hegna family descended rapidly from anxiety and tension over the safety of Charles Hegna, who they knew traveled widely in the Middle East, to intense mental anguish and grief over his death. This was followed by years of continuing mental anguish, grief and prolonged bereavement, and in Edwena Hegna's case, severe clinical depression.

40. Edwena lost her husband and companion. She was 43 years old at the time of her husband's death and had a life expectancy of 37.3 years.

41. During the first year following her husband's death, Edwena lapsed into a deep clinical depression. She exhibited symptoms of regressive behavior, including irrational fear and panic, and often discussed suicide and the loss of all meaning in her life. This condition is observed in cases of severe depression and post-traumatic shock syndrome.

42. Approximately one year after her husband's death Edwena was committed voluntarily to Springwood, a psychiatric institution where she received treatment for her depression over the next thirty days.

43. In January, 1985, Michael Riskin became Edwena's therapist and cared for her until 1995, when she moved to Arizona. Riskin observed that Edwena's life was a daily torment during this time, especially during the early years when she saw him twice each week. These visits to Riskin provided an emotional safe haven for Edwena.

44. Edwena continues to contend with depression on a daily basis and has made only slight improvement. She attempted to go to college at one point, but she did not finish. She has tried to work, but has been able to do so only sporadically. This situation is largely due to her emotional state, which creates an inability to focus and to cope with routine challenges

45. The four Hegna children enjoyed a loving, respectful relationship with their father. This relationship was especially important to the well-being of Hegna's youngest children, Lynn and Paul.

46. When Hegna died, Paul Hegna was seventeen and experiencing some difficulties associated with his gay sexual orientation. Lynn Hegna, twenty-one, was experiencing the challenges of life as an unwed mother of a six month old infant, Holly. Both were greatly dependent on their father, and the challenges they were facing were complicated by his death.

47. Paul was a junior in high school when his father was murdered. He struggled to achieve because of his dyslexia, but hoped to go to college. After Hegna's death, he repressed his desire to disclose his sexual orientation because he did not want to add to his mother's burdens. He therefore lost the opportunity to

develop his own personal, intimate relationships with others. Unable to seek his father's guidance and frustrated by his concern for his mother and her burdens, his development as a young, gay adult was thwarted. Because Paul has AIDS, his life expectancy is difficult to determine.

48. Lynn's pain on her father's death was deepened because she had not reached an understanding with him on an appropriate plan for life as a single parent, something they were working on but were in disagreement about at the time of his death. Lynn considered her father her best friend and she depended heavily on his advice.

49. Lynn has been unable to share important events in Holly's life with her father or to know the joy of seeing her daughter interact with her grandfather.

50. Lynn was 21 at her father's death, with a life expectancy of 59.5 years.

51. In they years following Hegna's death, his oldest sons, Steven and Craig, floundered. Neither Steven nor Craig ever married and neither has a child of his own.

52. Four years after his father's death, Craig regained his focus on life and began his training in the machinist trade, a trade he thoroughly enjoys. He lost, however, a part of his life during the four-year period following his father's murder.

53. Due to his father's brutal murder and his mother's emotional state, Steven suffered from confusion and a lack of guidance for seven years after his father's death. He regained his focus when he began work for a POW-MIA support

organization. He now works for a company that assists those who have lost loved ones to deal with the pain in their own lives.

54. Steven and Craig continue to experience grief and anguish over their father's death. They still ask themselves whether their father would be proud of them and the work they do today.

55. Craig was 24 years old at the time of his father's death and had a life expectancy of 50.4 years.

56. Steven was 26 years old at the time of his father's death and had a life expectancy of 48.6 years.

## CONCLUSIONS OF LAW

1. The Islamic Republic of Iran is a foreign state and has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. §2405(j)) continuously since January 19, 1984. *See* 31 C.F.R. 596.201 (current through Oct. 8, 2001.)

2. Acting as an agent of the Islamic Republic of Iran, MOIS performed acts within the scope of its agency within the meaning of 28 U.S.C. §1605(a)(7) and 28 U.S.C.A. §1605 note, which caused the death of Hegna. Specifically, MOIS acted as a conduit for the Islamic Republic of Iran's provision of funds and training to Hezbollah for its terrorist activities.

3. Because Charles Hegna was falsely imprisoned, brutally assaulted, and tortured by those engaged in state sponsored terrorism and his death was caused by a

willful and deliberate act of extra-judicial killing, plaintiffs have a cause of action under 28 U.S.C. §1605(a)(7) and 28 U.S.C.A §1605 note.

4. Charles Hegna's death was the result of a horrific "terrorist [murder], in which the tragedy itself is amplified by the malice which inspired the event. The malice associated with terrorist [killing is the same as] that of premeditated murder. The intended audience of a terrorist attack is not limited to the families of those killed and wounded or even just [Kuwaitis], but in this case, the American public, for the purpose of affecting United States government [policy]. The terrorist's intent is to strike fear not only for one's own safety, but also for that of friends and family, and to manipulate that fear in order to achieve political objectives. Thus the character of the wrongful act itself increases the magnitude of the injury. It thus demands a corresponding increase in compensation for increased injury." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998).

5. The conduct of Iran and MOIS in releasing terrorist hijackers in their control was a violation of fundamental principles of international law that Iran had a duty to upheld. If terrorist airline hijackings are to be suppressed, hijackers must be tried, convicted and punished in accordance with multi-national treaty obligations. Iran's failure to comply with the Convention for the Suppression of Unlawful Seizure of Aircraft warrants the condemnation of all civilized nations and their legal institutions, and must therefore be given special weight in fixing the punitive damages for which Iran is liable.

6. Each of the individual plaintiffs is entitled to an award of solatium as a result of the wrongful death of Hegna. Edwena is also entitled to an award for loss of consortium.

7. The testimony of Edwena Hegna, her children, and that of her therapist, Michael Riskin, is accepted in its entirety.

8. Edwena Hegna is entitled to damages for loss of solatium and consortium measured by the extent of her mental anguish, grief and bereavement and the pain associated therewith over the past 17 years and over her remaining life expectancy, a period of approximately 20 additional years, for a total of 37 years.

9. Each of the Hegna children, as the heirs-at-law of Hegna, is entitled to compensation for solatium over the past 17 years and over their remaining life expectancies: Steven (31.6 years); Craig (33.4 years); Lynn (42.5 years); and Paul (39.9 years).

10. The evidence presented in this case established that it is appropriate to assess punitive damages against defendants pursuant to 28 U.S.C. §1605(a)(7).

11. Plaintiffs are entitled to an award of damages in the following amounts:

| | |
|---|---|
| Edwena Hegna | $26,000,000 |
| Craig Hegna | $3,000,000 |
| Steven Hegna | $3,000,000 |
| Lynn Hegna | $5,000,000 |
| Paul Hegna | $5,000,000 |

Punitive Damages     $333,000,000 (to be divided equally between each plaintiff)

Date: 1/18/02

Henry H. Kennedy, Jr.
United States District Judge