

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

April 15, 2013

<u>BY EMAIL (ForrestNYSDChambers@nysd.uscourts.gov)</u>

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 730
New York, NY 10007

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   4/22/13
```

Re:   <u>**In re 650 Fifth Avenue and Related Properties,**</u>
        **08 Civ. 10934 (KBF)**

Dear Judge Forrest:

        Pursuant to the Court's March 15, 2013, Order, the Government writes with respect to claimants the Alavi Foundation's, 650 Fifth Avenue Company's, Assa Corporation's, and Assa Company Ltd.'s invocation of the attorney-client privilege and attorney work-product doctrine with respect to documents responsive to discovery requests.  For the reasons discussed below, the crime-fraud doctrine applies to otherwise privileged communications or work product made in furtherance of criminal or fraudulent schemes by the claimants, and those communications are not protected by privilege.  Specifically, communications or work product in furtherance of the claimants' fraudulent and criminal schemes to (a) conceal Bank Melli's ownership or control of Assa Corporation and Assa Company, Ltd., and (b) conceal the influence of Iranian governmental agencies and officials in the formation of 650 Fifth Avenue Company and the actions and operations of the Alavi Foundation and 650 Fifth Avenue Company, are not entitled to the protections of the attorney-client privilege.  Similarly, the claimants should not be entitled to invoke privilege on these matters during depositions or at trial.

        In addition to the application of the crime-fraud doctrine, the claimants' invocation of the attorney-client privilege or the attorney work-product doctrine suffers from other deficiencies, including the failure to adequately establish that certain communications were for the purpose of securing legal advice rather than for a non-legal purpose, and failing to establish that communications were confidential.  For example, one of Assa Corporation's corporate officers, Peter Livingston, was both outside legal counsel for Assa and corporate secretary.  In light of Mr. Livingston's dual role as legal counsel and corporate officer, Assa

Corporation's and Assa Company Ltd.'s privilege logs fail to adequately establish that communications involving Mr. Livingston were for the purpose of securing legal advice, rather than for general corporate or business purposes. In addition, the claimants have asserted privilege with respect to communications between each other, including discussions about the settlement of litigation between them.

Finally, the Assa claimants have failed to produce a number of types or categories of relevant records that we would expect to be in the claimants' (including their officers and directors) possession, custody, and control.

## Relevant Law

The attorney-client privilege protects from disclosure confidential communications between a client and his or her attorney for the purpose of obtaining or providing legal advice. *See United States* v. *Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (citing *In re County of Erie*, 473 F3d 413, 419 (2d Cir. 2007)). The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* (quoting *Upjohn Co.* v. *United States*, 449 U.S. 383, 389 (1981)). To balance this interest with the competing value of disclosure of relevant information, the privilege applies "only where necessary to achieve its purpose," and the privilege is "construe[d] . . . narrowly because it renders relevant information undiscoverable." *Id.* (quoting *Erie*, 473 F.3d at 418). The party asserting the privilege bears the burden of establishing its essential elements. *Id.* (citing *von Bulow ex rel. Auersperg* v. *von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987)).

The privilege applies only to communications concerning legal, as contrasted with business, advice. *In re Grand Jury Subpoena Duces Tecum dated September 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984) (quoting *In re John Doe Corp.*, 675 F.2d 482, 488 (2d Cir. 1982)).

Moreover, "it is well-established that communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena*, 731 F.2d at 1037 (citing *Clark* v. *United States*, 289 U.S. 1, 15 (1933); *John Doe Corp.*, 675 F.2d at 489-93; and *In re Int'l Sys. and Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1983)). "Such communications are properly excluded from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose." *Id.* (citing *United States* v. *Hodge and Zweig*, 548 F.2d 1347, 1354 (9th Cir. 1977)). The crime-fraud doctrine applies where there is probable cause to believe that a crime or fraud was being committed or attempted, and that the communication or work product was in furtherance of the criminal or fraudulent scheme—in other words, that "a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *Id.* (citing *John Doe Corp.*, 675 F.2d at 491 & n. 7; *Int'l Sys.*, 693 F.2d at 1242 n.11).

## The Claimants' Fraudulent and Criminal Schemes

The allegations in the verified Amended Complaint in this matter, supported by other evidence, show that the claimants were engaged in a multi-year fraudulent and criminal scheme to (a) conceal Bank Melli's ownership or control of Assa Corporation and Assa Company, Ltd., and (b) conceal the influence of Iranian governmental agencies and officials in the formation of 650 Fifth Avenue Company and the actions and operations of the Alavi Foundation and 650 Fifth Avenue Company.   The Court is thoroughly familiar with the allegations in the Amended Complaint, and certain representative allegations and facts will be summarized here.

As alleged in the Amended Complaint, the Alavi Foundation was formed in the 1970s by Shah Reza Mohammad Pahlavi, then the Shah of Iran.   At that time, the foundation was known as the Pahlavi Foundation.   With a $42 million construction loan from Bank Melli (funded by the Bank Markazi, the Central Bank of Iran), the Pahlavi Foundation built the land and constructed commercial office building presently located at 650 Fifth Avenue, New York, New York (the "Building").   (Am. Compl. ¶ 24).   During and immediately following the Iranian Revolution, the board of directors of the Pahlavi Foundation was entirely replaced and the Foundation renamed itself the Mostazafan Foundation of New York; in 1992, it was again renamed as the Alavi Foundation (the "Foundation").   (*Id.* ¶ 27).   The foundation was subject to the supervision of the Bonyad Mostazafan va Janzaban (the "Bonyad Mostazafan"), an Iranian government agency formed for the purpose of taking possession of and managing property expropriated by the revolutionary government (*id.* ¶¶ 26, 28, 30, 32-46) and, later, the supervision of the Iranian Mission to the United Nations ("IMUN").   (*Id.* ¶¶ 49-49-81).

The Bank Melli mortgage on the Building resulted in a substantial tax liability to the Foundation relating to the Building's rental income.   (Am. Compl. ¶ 31).   To avoid this tax, the Foundation transferred ownership of the Building to a partnership, 650 Fifth Avenue Company (the "Partnership"), whose partners are the Foundation and Assa Corporation.   (*Id.* ¶¶ 31, 38-48).   Assa Corporation and its parent, Assa Company Ltd., are shell companies controlled by Bank Melli.   (*Id.* ¶¶ 47, 117-119).   The Partnership arrangement was negotiated and agreed by high-level Iranian government officials, including the head of the Bonyad Mostazafan and other high-ranking officials of the Bonyad, Deputy Prime Minister of Iran, Prime Minister of Iran, director of Bank Markazi (the Central Bank of Iran), and the general director of Bank Melli.   (*Id.* ¶¶ 33-40).

The original directors of Assa Company Ltd. were Mohammad Hossein Behdadfar, a Bank Melli board member, and Mohsen Kakavand, a manager for Bank Melli in London.   (Am. Compl. ¶¶ 38, 40, 44).   One purpose of using the Assa companies to Bank Melli's interest in the partnership was fear that the IRS would view the transaction as fraudulent.   (*Id.* ¶ 36 (describing a March 22, 1988, letter between Foundation board members discussing options for resolving the tax problem and noting that "The probability of the IRS agreeing with the exchange of the loan for a proportion of the partnership share [by Bank Melli] is very weak.   The IRS will argue that no real change has been made except the loan has been changed in name to capital, with the only result being the payment of no tax.   The IRS will therefore consider it tax evasion.").   Indeed, in communications with the IRS and with

pertinent New York state agencies, Bank Melli's control over Assa Corporation and Assa Company Ltd. was not disclosed and the partnership transaction was represented as arms-length in nature.  (*See, e.g.*, *id.* ¶¶ 44-46).

The influence of Iranian government agencies and officials over the Foundation and the Partnership was also concealed to avoid risking the Foundation's not-for-profit status.  In letters to the Ayatollah and to the Iranian Ambassador to the IMUN, Mohammed Badr Taleh—at the time, President of the Foundation before being forced out by the Ayatollah, as conveyed by the Ambassador and the head of the Bonyad Mostazafan—fretted about the consequences for the Foundation should the Ambassador's influence be discovered:  "[T]he the danger posed by your [Kamal Kharrazi, Ambassador to the IMUN] direct interference in the affairs of the Foundation, in view of the very dire political and security atmosphere in America, is not hidden to all; God forbid it should cause numerous problems for the Foundation. . . ."  (Am. Compl. ¶¶ 56-57; *see also id.* ¶ 56 (in a letter to the Ayatollah: "Although brother Kharrazi's appointment to a position of responsibility connected to the Foundation's affairs presents enormous political, security, and economic dangers, we feel assured that the Supreme Leader has made this decision with discernment, unique insight, and a thorough knowledge of all pertaining aspects.")).

Concealment of Bank Melli's control of the Assa partnership interest, and the role of high-ranking Iranian government officials in arranging the transaction, was also intended to protect the Foundation from civil litigation that was prevalent in the late 1980s and early 1990s, near the time of the partnership transaction.  (Am. Compl. ¶¶ 101-108).  In 1993 correspondence with an employee of the Foundation's Tehran office about pending litigation against the Foundation where its relationship with the Government of Iran was at issue,[1] Mohammed Geramian, the Foundation's president at the time, noted that "It is necessary to explain that this defense, according to the facts, indicates the denial of any relationship as well as financial and administrative relations between the government of Iran and Mostazafan and Janbazan."  (*Id.* ¶ 106(a)).  Bank Melli, similarly, was a defendant in several U.S. lawsuits in the 1980s.[2]

In the mid-1990s, the concealment of Bank Melli's control of Assa Corporation and Assa Company Ltd., and the concealment of the influence of Iranian governmental agencies

---

[1]  *See Norman Gabay* v. *Mostazafan Foundation of Iran et al.*, 92 Civ. 6954 (SHS) (S.D.N.Y.); *Steven Flatow* v. *The Alavi Foundation*, No. CA-98-4152 (AW) (D. Md.).

[2]  *See Crocker Nat'l Bank* v. *Bank Melli Iran et al.*, 79-3555 (N.D. Cal.); *Farhani* v. *Bank Melli et al.*, 440009 (Cal. Sup. Ct., Santa Clara Co.); *First Chicago Int'l Bank* v. *Bank Melli et al.*, 79-1002 (E.D. Wis.); *First Chicago Int'l Bank* v. *Bank Melli et al.*, 22802/79 (N.Y. Sup. Ct.); *Harris Int'l Telecom* v. *Bank Melli Iran*, 79-0802 (S.D.N.Y.); *Itek Corp.* v. *Bank Melli et al.*, 80Civ. 58 (D. Mass.); *Pan Am. World Airways* v. *Bank Melli Iran, et al.*, 79-1190 (S.D.N.Y.); *Wyle* v. *Bank Melli Iran et al.*, 80-1131 (N.D. Cal.); *El Indus. Int'l* v. *Cont. Ill. Nat'l Bank*, 81 Civ. 5773 (N.D. Ill.); *Stromberg-Carlson Corp.* v. *Bank Melli Iran*, 79 Civ. 1167 (EW) (S.D.N.Y.); *E-Systems* v. *Bank Melli Iran*, No. CA-3-79-1487-G (N.D. Tex.); *Chicago Bridge & Iron Co.* v. *Bank Melli Iran*, No. 80 C 2864 (N.D. Ill.).

and officials in the formation of 650 Fifth Avenue Company and the actions and operations of the Alavi Foundation and 650 Fifth Avenue Company, took on an additional fraudulent and criminal purpose. In 1995, pursuant to the IEEPA, President William Jefferson Clinton issued Executive Orders 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995), and 12959, 60 Fed. Reg. 24757 (May 9, 1995), which together declared a national emergency with respect to the actions and policies of the Government of Iran and, with exceptions not applicable here, banned the supply or exportation of any service from the United States to Iran. *See also* Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 21, 1997); Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 21, 1997). The Iranian Transactions Regulations (the "ITR"), Title 31, United States Code of Federal Regulations, Part 560, were adopted in 1995 (and as subsequently amended) to implement these Executive Orders. And in 1999, the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), specifically identified Bank Melli as an entity owned or controlled by the Government of Iran. 31 C.F.R. Part 560, App. A.[3]

The concealment of these matters was so important to the claimants that the Foundation's corporate secretary, in notes from June 2001, wrote "Problem - <u>Government separate</u> - <u>Foundation</u> 'Sure death'." (Am. Compl. ¶¶ 92). In notes from July 2003, he further wrote: "Assa dangerous → Get rid of it" and "You can't → It is illegal → Don't borrow → It is illegal → urgent situation" (*id.* ¶ 93); as well as "Foundation benefits → Person–in-charge → Foundation interests → Collusion and illegal arrangement → Another one → They had to" and "Assa record → Problem with payment method → 8 → Regarding interest, it is not a problem → Mr. Zarif [Iranian Ambassador to the IMUN from August 2002 through July 2007] → Assa → Bank Melli 40% share → I cannot sleep at night." (*Id.* ¶ 94). When Farshid Jahedi, the Foundation's president from 2007 until his conviction for obstruction of justice, was served with a grand jury subpoena in 2008 for documents concerning Assa Corporation, he destroyed records rather than produce them to law enforcement. (*Id.* ¶¶ 109-111).

Assa Corporation's interest in the Partnership originally was 35%, and later amended to 40%. Since the formation of the Partnership, the Foundation and the Partnership have directed the distribution of millions of dollars to the Assa entities from the income from the Building. (Am. Compl. ¶¶ 96, 100, 121).

## Discussion

The facts alleged in the verified Amended Complaint, as summarized in part above, amply demonstrate probable cause to conclude that the Alavi Foundation, Assa Corporation, Assa Company Ltd., Bank Melli, and various Iranian governmental officials conspired to perpetrate and attempt to perpetrate crimes and frauds by concealing Bank Melli's ownership

---

[3] In addition, on October 25, 2007, Bank Melli and all of its offices worldwide were added to the Specially Designated Nationals list pursuant to the Weapons of Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. Part 544, and Exec. Order 13382, 70 Fed. Reg. 38567 (July 1, 2005). Assa Corporation and Assa Company Limited were added to the SDN list on or about December 17, 2008.

and control of Assa Corporation and Assa Company, Ltd., and concealing the influence of Iranian governmental agencies and officials in the formation of the Partnership and the actions and operations of the Foundation and the Partnership.

Assa Company Ltd. and Assa Corporation exist for a sole purpose:  they exist merely as shells for Bank Melli's control over its interest in the Partnership.  The Assa entities engage in no other business or activities.  All of the Assa entities' actions are in furtherance of this fraudulent and criminal purpose.[4]  Accordingly, any communications between Assa Corporation or Assa Company Ltd. and their counsel or related work product—including communications concerning their formation; Assa entities' employees, officers, or directors; the formation of the Partnership; filings or representations to State or federal governmental agencies; or dealings or communications with the Partnership, the Foundation, Bank Melli, other components of the Government of Iran, or their representatives—are in furtherance of the criminal and fraudulent schemes.   Similarly, any communications between the Foundation or the Partnership and their counsel—including communications concerning the formation of the Partnership; the Assa entities; the satisfaction of the Bank Melli mortgage; tax filings; representations or filings with the New York Bureau of Charities or the New York Department of State; or dealings or communications with the Assa entities, Bank Melli, other components of the Government of Iran, or their representatives—are also in furtherance of these fraudulent schemes.

### Additional Issues

In addition to the application of the crime-fraud doctrine, there are two other issues we wish to address. First, the claimants' privilege logs suffer from other deficiencies.[5] Second, Assa Corporation and Assa Company Ltd. have not produced a number of categories of pertinent documents that we would expect to be in their possession, custody, and control.

Should the Court find that the crime-fraud doctrine applies, other deficiencies in the claimants privilege logs will be rendered moot.  However, the privilege logs provided by the claimants are also deficient for reasons aside from the crime-fraud doctrine, including (1) failure to adequately establish that certain communications were for the purpose of securing legal advice rather than for a non-legal purpose, (2) failing to establish that communications were confidential, and (3) failing to establish, where the attorney work-product doctrine is invoked, that the materials were prepared in anticipation of any pending or imminent litigation.

---

[4]  In fulfilling this fraudulent and criminal purpose, the Assa entities were also involved in related frauds and crimes.  For example, Assa Corporation's sole U.S. representative and employee entered the United States through visa fraud.  (Am. Compl. ¶¶ 113-116).

[5]  Privilege logs prepared by the Assa claimants are annexed to this letter as Exhibit A and a privilege log prepared by the Foundation is annexed hereto as Exhibit B.  We respectfully request that these exhibits not be docketed until the claimants have an opportunity to take a position on whether they contain confidential information.

1.  <u>Failure to establish that communications were for the purpose of securing or providing legal advice</u>.  The Assa claimants' privilege logs contain a number of entries where it is not apparent that the purpose of the communications was securing or providing legal advice.  For example, a number of the communications are made by or directed to Peter Livingston, who was not only the Assa claimants' outside counsel but also a corporate officer.  It is the claimants' burden to show that these communications were for a legal, rather than business, purpose.  *See In re County of Erie*, 473 F.3d 413, 419-20 (2d Cir. 2007). Indeed, a number of privilege log entries relate to communications involving Mr. Livingston that appear to have a corporate or business, rather than legal, purpose (including letters exchanged with Mohamed Tafti, an Assa Corporation employee and corporate officer, "re: sale of Assa's interest," "re: closing," "re: financing," "re: invoice," or "re: payment"). Other entries in the Assa claimants' privilege log similarly fail to reveal any legal purpose. For example, the Assa claimants have asserted privilege with respect to a September 9, 2003, email from Hamid Firooznia (both the Assa claimants' and the Foundation's outside accountant) to Lawrence Shepps, an attorney, described simply as "email re: 650 Fifth Avenue."   There is no indication that this email from an accountant for both the Assa claimants and for the Foundation was for the purpose of obtaining legal advice.

2.  <u>Failure to establish that purportedly privileged communications were confidential</u>. In several instances, the Assa claimants have asserted privilege over communications with third parties.  For example, the Assa claimants assert an unidentified privilege (described as "Privileged and Confidential") with respect to 2004 communications with the Foundation's attorney about a settlement.   Similarly, the Assa claimants have asserted attorney-client privilege with respect to a September 14, 2005, email from a Department of Homeland Security email address to a New York attorney whose relationship to the claimants is unclear.   Communications with third parties are not confidential and not entitled to the attorney-client privilege or the attorney work-product doctrine.

3.  <u>Failure to establish that materials were prepared in anticipation of litigation</u>.  The Assa claimants have asserted the attorney work-product doctrine with respect to a large quantity of materials where it is not apparent that the materials were prepared in anticipation of litigation.  *See In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003) (doctrine applies to materials produced by or at the behest of counsel "in anticipation of litigation or for trial").   For example, the Assa entities have asserted the attorney work-product doctrine with respect to a number of law firm memoranda prepared in the summer of 1989, when the Partnership was being negotiated but no pending or threatened litigation is identified.  The doctrine has also been invoked for a large number of non-litigation materials, including drafts of partnership documents, drafts of assignments and other contractual documents, invoices, a Partnership income and expense statement and balance sheet, and various undated notes and drafts.

4.  <u>The Foundation's privilege log</u>.  Prior to the formal production of discovery in this matter, the Foundation and the Partnership were provided electronic copies of various records seized during the search warrant executed on the Foundation's offices.  Counsel for the Foundation provided a privilege log identifying certain documents or portions of documents as attorney-client privileged or attorney work product.  The log, however, is insufficient for discovery purposes because it does not provide sufficient information

demonstrating the basis for the invocation of the applicable privilege.  We therefore request a supplemental privilege log from the Foundation and the Partnership providing that information with respect to the documents or excerpts with respect to which they claim privilege.

5.  <u>The Assa Claimants' failure to produce certain records</u>.  Finally, we note that the discovery produced by the Assa Company Ltd. and Assa Corporation to date does not contain several categories of documents that one would expect to have been produced in response to our discovery requests.  At this point, the Assa claimants' discovery has not included records (including email or other correspondence) relating to the selection and appointment of Assa Corporation and Assa Company Ltd. board members beyond sparse, occasional documentation indicating that such action has taken place, nor has it included documents (including email or other correspondence) relating to the hiring or dismissal of employees, contractors, or other personnel and agents.  There has been no production of financial records or correspondence concerning Assa Company Ltd.'s use or disposition of Partnership distributions—a particularly noteworthy omission, since the Assa entities exist for no other purpose than as a shell for Bank Melli's interest in the Partnership.  The document requests issued by the Government in this case include a number of requests for which such documents would have been responsive, including, but not limited to, "All documents related to any property or assets of Assa," and "All documents relating to any business activity of Assa."

<u>Conclusion</u>

For the foregoing reasons, we respectfully request an order stating that the crime-fraud doctrine applies to the otherwise-privileged communications and/or work product documents described above.  In addition, we respectfully request a discovery conference before the Court, during which the parties can address the problems related to the privilege logs and omissions from discovery detailed above.

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:      /s/ Michael D. Lockard
Sharon Cohen Levin
Michael D. Lockard
Martin S. Bell
Assistant United States Attorneys
(212) 637-1060/2193/2463

Encls.

cc:      Counsel of record (by email)